### SAM GAGE v. STATE.

#### No. 2018. Decided November 27, 1912.

#### 1.—Assault to Rape—Female Under Age of Consent—Force.

The law of this State is that in an assault to rape a child under fifteen years of age, or in committing the act of rape upon such child, the statute means what it says, that the offense is complete and is constituted whether it is with or without force, and neither the indictment nor the proof need to show that force was used to commit such an act. Following Hightower v. State, 65 Texas Crim. Rep., 323.

#### 2.—Same—Case Stated—Sufficiency of the Evidence.

Where, upon trial of assault to rape upon a female under the age of fifteen years, the evidence showed that the defendant had threatened to have carnal intercourse with such female without her consent and by force if it was necessary; that he met her in a secluded place while she was coming from school through the woods and asked her to give him a piece, whereupon, she became frightened and ran and he ran after her trying to catch her, but when they got near a house, still running, the girl told him that she would tell the inmate of the house, when defendant desisted and went off, the defendant was guilty of an assault to rape, although he did not actually touch prosecutrix and was some distance away from her, but was doing everything possible in his power to do so, and was only prevented by the fact that she outran him. Davidson, Presiding Judge, dissenting.

#### 3.—Same—Definition of Offense.

Where, upon trial of assault with intent to commit rape, the defendant attempted an assault and battery upon a female under the age of consent, with all the means within his power at the time and was only prevented from doing so by the prosecutrix outrunning him, and thereby, succeeded in escaping from him, and that his intention was to have carnal intercourse with her by force, the offense was complete. Davidson, Presiding Judge, dissenting.

#### 4.—Same—Preventing of Battery—Assault.

It does not require the intervention of some third party to prevent the battery; the statute clearly contemplates that anything which prevents the accused from doing so is embraced and included within the statute; and where prosecutrix outran the defendant who intended to assault her by force to have carnal intercourse with her, she being under the age of consent, the assault was complete. Davidson, Presiding Judge, dissenting.

Appeal from the District Court of Hood. Tried below before the Hon. W. J. Oxford.

Appeal from a conviction of assault with intent to rape; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Jno. Davenport* and *Levi Herring* and *Estes & Estes,* for appellant. On question of insufficiency of the evidence: Cromeans v. State, 59 Texas Crim. Rep., 611, 129 S. W. Rep., 1129; Crooms v. State, 51 S. W. Rep., 924; Carroll v. State, 24 Texas Crim. App., 366; Flournoy v. State, 25 id., 244; Carter v. State, 70 S. W. Rep., 971; Hudson v.

State, 49 Texas Crim. Rep., 24, 90 S. W. Rep., 177; Alexander v. State, 58 Texas Crim. Rep., 621, 127 S. W. Rep., 189; Loid v. State, 55 Texas Crim. Rep., 403, 116 S. W. Rep., 807.

*C. E. Lane,* Assistant Attorney-General, and *Jno. J. Hiner,* for the State.

PRENDERGAST, Judge.—Appellant was indicted, convicted and given the lowest penalty, two years, for an assault upon a little girl, Pearl Martin, 12 years of age, with the intent to have carnal knowledge of her, she not being his wife, alleged to have occurred on or about March 20, 1912.

Appellant did not testify. The testimony is uncontradicted. It shows this state of fact. That appellant, whose age was not given, but the circumstances show was a young man, living with his father in the community where the assault occurred, knew this little girl and had known her for some time, and went to the same school which she did the year before; that the little girl lived with her uncle, her mother being dead and her father away, and had, since she was two years old, and lived about one mile from the schoolhouse where she was then attending school; that in going back and forth to and from school she went alone generally and most of the way along a public road, but that when she got to the place of a Mr. West she went into his pasture, thence along a trail about a quarter of a mile therein, to the schoolhouse, it being situated in Mr. West's pasture; that in thus passing along through this pasture she was about 200 yards from the West residence, which fronted the opposite direction from where she was when this assault occurred, and that between the residence and where she was, the barn, lots, stables and other outhouses of Mr. West were located, and that also between where she was and the West premises were scattering trees and perhaps some undergrowth; that at the point where she would enter and did enter this pasture of Mr. West on her way back and forth to school was a skirt of timber and undergrowth. On one side of the trail she traveled, this timber was thick or heavy and on the other side, between there and the West house, the timber was more open and scattered.

That some few weeks before this assault, one Pendergrast, a State's witness in this case, who showed that he was a rural mail carrier and that he was in the habit of going along this trail through this skirt of timber to reach the boxes to take up and deliver mail matter, stated that he knew both the appellant and said little girl, and knew that the little girl was in the habit of going back and forth along this trail to and from school; that he had seen her repeatedly do so. This witness then testified, as shown by the statement of facts, this: "Something like a month before the date of the matter in controversy, I was returning from my rural mail box to my home, and having crossed the trail along this bunch of timber, I saw the defend-

ant lying on the ground in a thicket and near the trail or pathway used by Pearl Martin. At the time I saw defendant he was about middle ways of the timber, and some fifteen or twenty steps from the trail. He got up from the ground as I came up to him, and we stood there talking for a few minutes when the girl, Pearl Martin, came along the trail on her way from school. Just as the girl passed by us, defendant said to me: 'I would like to have a piece of that.' I made no reply or comment on his remark, and he then said again: 'Do you reckon I could get it in her?' I told defendant I did not know, and he then said: 'I am going to ask her for a piece some day, and if she don't give it to me I am going to take it away from her.' I then said to defendant that he had better not do anything like that, and that he was liable 'to get his foot in it.' Defendant and I then talked there for a few minutes, and I started on my way home, and defendant started back and went in the direction of his home.''

We think it best, under the circumstances, to here give in full a copy of the testimony of this little girl, Pearl Martin, as it is contained in the statement of facts before us:

''I live with my uncle, A. J. Robertson, close to the town of Tolar. My mother is dead. I do not know where my father is. I am now twelve years old and have lived with my uncle since I was two years old. I attend school near Tolar, and have to go something like a mile from my home to the schoolhouse, located on the Owen West farm, first going the road through the Gage farm, and then through the fence into Mr. West's pasture, and along a trail way by a bunch of timber adjoining the West farm, and by a fence enclosing the West field and pasture. It was my custom to go this way, as the distance by the public road was longer. Along this trail way the timber was on my right and the fence on my left as I went south to the schoolhouse, through Mr. West's pasture. On the day of the trouble with the defendant, I had gone in the usual way towards the schoolhouse, and had got into the pasture, and through the fence and into the trail by the timber, when I saw the defendant coming through the timber. I do not know the direction he came from, as I just happened to look up and see him coming towards me through the timber, walking as though he was coming to the trail where I was, and I then walked on pretty fast. When he got up to where I was, he asked me if I had seen the calves. He was then near the trail where I was. I told defendant I had not seen them. (The witness was then interrogated, and answered as follows:) Q. Then what did he say to you? A. He said: Give me a piece. Q. Then what did you say to him? A. I didn't say anything; I just went on. Q. How did you go? A. I run. Q. What did you run for? A. I was afraid of him. Q. When you ran, what did he do? A. He ran, too. He ran after me a distance of about sixty yards. We were running in the direction of Mr. Owen West's house, and defendant stopped just before we got to the edge of the timber. As we got there I told him

I was going to tell Mr. West on him, and he stopped and went back towards his home or off into the woods. Q. Did he try to catch you? A. Yes, sir, it looked like he was. Q. What kept him from catching you? A. I was running down the path and he had to go around the bushes and he was trying to head me off, and I outran him. After I had run through the timber, or after I had got to the edge of it, I ran to Mr. West's house, where my teacher, Miss Beulah Woodward, lived, and told her what had happened. I also saw Mrs. West, and my teacher told her what I had said, and I then went on back home and did not go to school that day until some time later in the day. I told my folks at home about what the defendant had done. All this occurred in Hood County, Texas. I was not the wife of the defendant.''

Cross-examined, the witness said: ''I am in the fourth grade in school, and study arithmetic, geography, grammar, physiology, etc. Defendant has also attended the same school where I was, and was there a portion of the time last winter and also last summer. He did not attend the last term of the school. I have been at the defendant's home a number of times, but do not recall that he has ever been at my home. He had never offered me any insult before the occasion referred to, but always treated me nicely, and I was never afraid of him before this occasion as I was then. I usually went from home through this trail by the timber in going to my school, but in returning home I generally went another route, unless defendant's sister was at school, when I would go back the same trail way with her. I have no recollection of seeing defendant and Mr. Pendergrast in the timber before the occasion in question. When the defendant was running after me, and we had got to the edge of the timber, I could not see anybody at Mr. West's home. I could see the house, or where the house was, but there was nobody that I could see. The barn was between his house and where we were at the time. I don't know which way defendant had come from when I first saw him in the woods; he was just coming to where I was walking towards the trail and first asked me if I had seen his calves. I don't know what he had been doing. I just happened to look up and saw him coming towards me. After we had run some distance towards the edge of the timber, I could see some other children going to school along the road the other side of Mr. West's barn. I was then running in their direction. After I began to run, defendant told me to stop, and I told him I wouldn't stop, and that I would go and tell Mr. West on him. He did not then intimate to me not to tell what had happened or what had been said, but turned back into the woods and went off. He did not put his hands on me because he didn't have the chance to do so. (The witness, interrogated, answered as follows:) Q. How close did he get to you? A. About a yard. Q. Let's have the distance now, as near as you can, call out some object in this room— some distance across this room? A. About as far as from me to you.

(Estimated to be eight to ten feet.) Q. When you went to running, he never did get any closer to you? A. No, sir. Q. Were there any obstructions between you and him? A. Yes, sir, the bushes were between us. Q. When he went to running after you did he get in the trail where you were, or did he run out away from the trail? A. No, sir, he never got in the trail; he just run around the trees; he jumped over some bushes, and said I want to tell you something. Q. You told him you wouldn't wait, and for him to go away, and he then turned and left you? A. Yes, sir. I have only guessed at the distance I ran as sixty yards. Defendant didn't run as far as I did, as I ran until I got away from the woods. I just estimate the distance the defendant and I ran together as sixty yards. I suppose the defendant can outrun me, but he couldn't catch me on account of the bushes he was running in. I would gain on him when he was going around the bushes. I don't know whether he could have caught me or not, but I was running my best."

Re-examined by the District Attorney: "Defendant did not stop running after me until I told him I was going to tell Mr. West, and when I did so tell him he stopped and turned back into the woods. I was running as best I could, and defendant seemed to be trying to head me off. I only guess at the distance from that place to the home of Mr. West, and do not really know the distance, but after I got out of this bunch of timber Mr. West's house was in plain view of me."

Her teacher, Miss Woodward, testified that she first saw this little girl on that morning about 8 o'clock, when she, the witness, was preparing to go to school; that the girl on this occasion first came to the West house in Mrs. West's room and then to her room, and upon being asked how she was, she stated that she was scared most to death. "As she told me that she broke down and commenced to cry, and fell over on my arm. I was standing in front of the dresser at the time, and pulled her up to me and told her to sit down and calm herself and tell me what was the matter." The State then introduced Mr. West, and Mr. Bowman, the deputy sheriff, who, having heard of this matter, investigated it for tracks along this trail. The effect of their testimony is that they describe the location substantially as stated above; that they hunted for tracks where the little girl claimed to have been chased by the appellant, and found on the ground where she had indicated appellant had run her, her tracks showing that she had run as claimed by her, and the tracks of a man showing where he had jumped over and run around undergrowth and brush substantially as detailed by her, and that those tracks showed that the person was running and jumping in the direction and for the distance testified to by the little girl; in fact, in every way confirming and corroborating her testimony.

There is no bill of exceptions in the record. In the motion for new trial there are some very general complaints of the charge of

the court. They point out no specific error whatever, and are too general to be considered by this court under the uniform holding and ruling thereof. Byrd v. State, recently decided; Berg v. State, 64 Texas Crim. Rep., 612; 142 S. W. Rep., 884; Ryan v. State, 64 Texas Crim. Rep., 628; 142 S. W., 878. However, the appellant's contention on these complaints seems to be that the court did not in his charge require that force and an actual battery should be committed upon this child before a conviction was authorized. The court's charge, as a whole, is an admirable one and properly submits the questions to the jury. It can not longer be doubted that the law of this State is that in an assault to rape a child under 15 years of age, or in committing the act of rape upon such child, the statute means what it says, that the offense is complete and is constituted whether it is "with or *without* force." In other words, that neither the indictment has to charge, nor the proof to show, that *force* was used to commit such an act upon such child, even though it is when such force is charged upon a woman over the age of 15 years. *Hightower v. State,* 65 Texas Crim. Rep., 323; 143 S. W. Rep., 1168, and cases there cited. Even if it was necessary to show force in such an assault upon a girl under 15 years of age, the evidence in this case abundantly and without contradiction shows that all the force that would be necessary in such a case was used by the appellant, conceding that he did not actually touch her person. He was doing everything possible within his power to do so, and was *prevented* only by the fact that she outran him and he could not and did not catch her before she came in sight and hearing of other persons.

The evidence in this case did not call for a charge on either aggravated or simple assault and none such whatever was requested by appellant on the trial. The evidence, without question, shows an assault with intent to rape, or nothing.

The indictment strictly follows the statute and is in accordance therewith and the approved forms, held many times to be sufficient by this court. None of the matters above mentioned require any discussion or further statement.

The fact is, the appellant's sole contention in his brief and argument is that the evidence is insufficient to sustain the verdict, and for that reason insists that this court should reverse and remand.

Our law defines rape on a child under 15 years of age, not the wife of the person committing the rape, as: "Rape is the carnal knowledge of a female under the age of fifteen years, other than the wife of the person, with or *without* her consent, and with or *without* the use of force, threats or fraud." Art. 1063, Penal Code. In other words, the mere act of carnal knowledge by a man with any child under 15 years of age is *ipso facto* rape. Also by our law an assault with intent to rape is: "If any person shall assault a woman with intent to commit the offense of rape, he shall be punished," etc. Article 1029, Penal Code. A "woman," in this statute, means any

female, and includes a child under 15 years of age. Under all the authorities in cases charging assault with intent to rape it is necessary for the court to define an *assault* as that is defined by our law. Our law in defining an *assault* also, at the same time, defines an *assault and battery*. Both of these offenses, assault, .and assault and battery, being defined by the same statute: "The use of any unlawful violence upon the person of another with intent to injure him, whatever be the means or the degree of violence used, is an assault and battery. Any attempt to commit a battery, or any threatening gesture showing, in itself or by words accompanying it, an immediate intention, coupled with an ability to commit a battery, is an assault." Art. 1008, P. C. Then Article 1012, Penal Code, says: "Any means used by the person assaulting, as by spitting in the face, or otherwise, which is capable of inflicting an injury, comes within the definition of an assault." Then follows the next, Article 1013, defining what is meant by "Coupled with ability to commit," saying: "1. That the person making the assault must be in such a position that, if not prevented, he may inflict a battery upon the person assailed. 2. That he must be within such distance of the person so assailed as to make it within his power to commit the battery by the use of the means with which he attempts it. 3. It follows that one who is, at the time of making an attempt to commit a battery, under such restraint as to deprive him of the power to act, or who is at so great a distance from the person assailed as that he can not reach his person by the use of the means with which he makes the attempt, is not guilty of an assault. But the use .of any dangerous weapon, or the semblance thereof, in an angry or threatening manner, with intent to alarm another, and under circumstances calculated to effect that object, comes within the meaning of an assault."

From these statutory enactments it is clearly shown that an assault with intent to rape is committed when an assault is shown, and the intent in committing it, is to have carnal knowledge. That it was appellant's intention on this occasion to have carnal knowledge of this child, we think cannot be questioned. As stated by him to the witness previously, he intended to ask her for it, and if she refused, he was by force going to take it away from her. Just what he had recently said he was going to do, he attempted with all the power within him to execute on this occasion. The law does not require that he shall commit a *battery* upon the child, but simply and solely an *assault*. He attempted an assault and battery upon her with all the means within his power at the time, and was *prevented* from doing so by the party herself outrunning him and thereby succeeding in escaping from him. That he could and would have at this time committed a battery on this child *if he had not been prevented,* is without doubt, and it can not be doubted, from the testimony. That he also alarmed her in this assault can not be doubted from the testimony. What was said by this court, through Judge Henderson, in

Gann v. State, 40 S. W. Rep., 725, is peculiarly applicable and pertinent here. It is: "Prosecutor, in fact, may not have been alarmed at the drawn knife, but this would not detract from the intent with which appellant may have drawn the knife and advanced towards him. Nor is the contention of appellant to the effect that he did not make an assault at all, because he was restrained before he made a battery, any more tenable. The fact that A. and B. have a quarrel, and that A. draws his knife and starts towards B., but before he gets to him, C. catches and restrains him, so it is impossible for him to get to B., would not constitute an assault under the statute, would be a monstrous doctrine. That is not what Subdivision 3, under Article 592, Penal Code 1895, means. In this case the assault was made when it was entirely possible for defendant to get to the prosecutor, and commit a battery upon him. There was no insuperable difficulty in this matter, but, after the assault was made, and while he was attempting to consummate his purpose, and commit a battery, he was arrested by a bystander and restrained. His assault, however, was complete when he had the ability to commit the battery. The fact that he was prevented from making a battery did not do away with the offense of an assault already committed by him." So it may be well said in this case that appellant was in position at the time he made the assault upon this child to have committed a battery upon her and would have done so unquestionably if he had not been *prevented. That he was prevented, there can be no question.* It does not require the intervention of some third party to *prevent* the battery. The statute clearly contemplates that *anything* which, or any person who, prevents him is embraced, meant and included. What prevented him on this occasion from committing the battery when he began the assault? Nothing but the fact that the child became alarmed and that she outran him. That he would have committed the battery if not thus prevented, can not be doubted. His assault was complete. The fact that he was prevented from making the battery, as said by Judge Henderson above, did not do away with the offense of an assault already committed by him. It would also, as said by Judge Henderson, be a monstrous doctrine to hold that under the circumstances in this case appellant did not commit an assault upon this child, simply and solely because he was prevented from consummating that assault into a battery, and it can not relieve him of the penalty for the offense he committed. In our opinion, the evidence clearly justifies, if it did not imperatively require, a finding that he was guilty and proven so, beyond a reasonable doubt, by the testimony in this case.

The judgment is affirmed. *Affirmed.*

DAVIDSON, Presiding Judge [dissenting].—The Gann case has absolutely no relevancy to the facts of this case. The statute provides that the party must be within reach of the party alleged to

be assaulted so as to be able to carry out his intent. The State's evidence positively places appellant where he could not either make an assault or take hold of the person of the little girl. No one prevented him from doing so. He did not get within reaching distance. This case will stand alone, sui generis, and in violation of the statute.

I cannot concur. I dissent. A party ought at least be brought within some shadow of the law.